UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN A. WILLIAMS,                               *
                                                *
          Plaintiff,                            *
                                                *
          v.                                    *          Civil Action No. 13-10771-JLT
                                                *
ESSEX TEN LLC, f/k/a OVATECH LLC,               *
f/k/a CONCEPT II LLC, et al.,                   *
                                                *
          Defendants.                           *

MEMORANDUM

March 13, 2014

TAURO, J.

I.        Introduction

          Plaintiff brings this action against his former employer Essex Ten LLC ("Essex Ten")[1] to

recover money and other benefits he claims are owed to him under his employment contract.

Plaintiff also names Defendants Women's Health USA, Inc. (erroneously named Women's

Health USA, LLC in the complaint) and Women's Health Sciences, LLC (collectively, "WHS

Defendants") as reach-and-apply defendants. Presently before this court is the WHS Defendants'

Motion to Dismiss for Lack of Personal Jurisdiction [#11]. For the reasons set forth below, the

WHS Defendants' motion to dismiss is ALLOWED.

II.       Background

          Plaintiff is an individual residing in Barnstable County, Massachusetts.[2] Essex Ten is a

New York limited liability company with its principal place of business in New York City, New

---

[1] As noted in the caption, Essex Ten was formerly known by several different names. For the sake of clarity, this court will simply refer to all of these entities as Essex Ten.

[2] Am. Compl. [#8] ¶ 3.

York.[3] Although Essex Ten is a New York company with its principal place of business in that state, it is registered to transact business in Massachusetts as a foreign corporation and maintains a place of business in Auburndale, Massachusetts.[4] Women's Health Sciences is a Delaware special purpose limited liability company with its principal place of business in Avon, Connecticut.[5] Women's Health USA, Inc. is a Delaware corporation with its principal place of business in Avon, Connecticut.[6]

Plaintiff filed his original complaint on April 3, 2013. Plaintiff asserted claims for breach of contract and unjust enrichment against Essex Ten. Plaintiff subsequently amended his complaint on November 26, 2013. In his amended complaint, Plaintiff added a reach-and-apply claim against the WHS Defendants. In essence, Plaintiff seeks an order requiring the WHS Defendants to pay to Plaintiff money they would otherwise pay to Essex Ten as ongoing earn-out payments in the event Plaintiff is successful on his claims against Essex Ten.

Plaintiff's amended complaint sets forth the following facts. On or about February 9, 2009, Essex Ten made a written offer of employment to Plaintiff.[7] Plaintiff accepted the offer several days later.[8] Pursuant to the offer of employment, Plaintiff was to serve as Essex Ten's President and CEO. His compensation was to include an annual salary of $310,000; expense

---

[3] Am. Compl. [#8] ¶ 4.

[4] Am. Compl. [#8] ¶ 5.

[5] Am. Compl. [#8] ¶ 6.

[6] Am. Compl. [#8] ¶ 7.

[7] Am. Compl. [#8] ¶¶ 8–9.

[8] Am. Compl. [#8] ¶ 11.

reimbursement; and a five-percent equity interest in Essex Ten, which would become fully vested after two years of employment.[9]

Plaintiff's duties included raising capital and supervising the research, development design, testing, and manufacture of a pharmaceutical product known as "Ovaprene."[10] Plaintiff performed all of his employment obligations for a period in excess of two years.[11] On approximately February 14, 2011, Essex Ten requested that Plaintiff accept a temporary deferral of fifty percent of his regular salary payments, which would serve as a bridge loan to Essex Ten.[12] As part of this request, Essex Ten agreed that it would reimburse Plaintiff his deferred salary within several months along with additional bonus compensation.[13] Plaintiff agreed to this arrangement and deferred salary payments of at least $36,000 while he continued to perform his job duties.[14] These duties included Plaintiff's continuing efforts to obtain funding for the development of Essex Ten's pharmaceutical products.[15]

Despite its agreement, Essex Ten did not pay Plaintiff his deferred salary. During the period following February 15, 2011, Plaintiff continued to incur expenses in the performance of his job duties and continued to submit reimbursement applications to Essex Ten.[16] Essex Ten failed to reimburse Plaintiff for his continued expenditures and Plaintiff lost at least another

---

[9] Am. Compl. [#8] ¶ 10.

[10] Am. Compl. [#8] ¶ 14.

[11] Am. Compl. [#8] ¶ 15.

[12] Am. Compl. [#8] ¶ 16.

[13] Am. Compl. [#8] ¶ 16.

[14] Am. Compl. [#8] ¶ 17.

[15] Am. Compl. [#8] ¶ 17.

[16] Am. Compl. [#8] ¶¶ 18–19.

$15,000 through October 31, 2011.[17] Beginning approximately May 13, 2011, Essex Ten stopped paying Plaintiff his salary. As a result, Plaintiff suffered further losses totaling at least $170,000.[18]

After Essex Ten stopped paying Plaintiff his salary on May 13, 2011, Plaintiff continued performing his duties as President and CEO. He continued to seek funding for the development of Ovaprene.[19] At some point after May 13, 2011, Plaintiff successfully procured Women's Health USA, Inc. as an investor for Essex Ten's pharmaceutical products.[20] In October 2011, E. Lisk Wyckoff, Jr., one of Essex Ten's board members, informed Plaintiff that Essex Ten would not pay Plaintiff the compensation owed to him and that such amounts would remain unpaid.[21] On or about May 25, 2012 the WHS Defendants acquired substantially all of the assets of Essex Ten.[22] Essex Ten has never paid Plaintiff any portion of the five-percent equity interest Plaintiff earned under his employment contract.[23]

---

[17] Am. Compl. [#8] ¶ 20.

[18] Am. Compl. [#8] ¶ 21.

[19] Am. Compl. [#8] ¶ 22.

[20] Am. Compl. [#8] ¶ 23.

[21] Am. Compl. [#8] ¶ 24.

[22] Am. Compl. [#8] ¶ 25. The amended complaint states that the WHS Defendants "purchased substantially all the assets *or other controlling interest in* . . . Essex Ten." Am. Compl. [#8] ¶ 25 (emphasis added). Subsequently, Andrea Balogh, the Senior Vice President and General Counsel for the WHS Defendants, clarified that the WHS Defendants only purchased assets from Essex Ten and did not assume liabilities such as those relating to Plaintiff's employment contract. Decl. Andrea Balogh Supp. Mot. Dismiss Pl.'s 1st Am. Compl. [hereinafter Balogh Decl.] [#12-1] ¶ 9. At the hearing on the motion to dismiss, counsel for Plaintiff stated that he had not personally seen the contract between Essex Ten and the WHS Defendants, but presently has no reason to doubt Defendants' representation that it was only an asset purchase. Consequently, this court proceeds under the assumption that the WHS Defendants only purchased assets from Essex Ten.

[23] Am. Compl. [#8] ¶ 26.

On December 30, 2013, the WHS Defendants filed a motion to dismiss Plaintiff's reach-and-apply claim on the basis that this court lacks personal jurisdiction over them. The WHS Defendants correctly pointed out that Plaintiff's amended complaint does not contain *any* factual allegations that the WHS Defendants conducted any business in Massachusetts or even an allegation that they are subject to personal jurisdiction in Massachusetts.[24] On January 13, 2014, Plaintiff filed an opposition to the motion to dismiss setting forth facts he contends are sufficient to subject the WHS Defendants to this court's jurisdiction. Accompanying the opposition are Plaintiff's sworn affidavit and a number of exhibits.

Plaintiff's opposition and the exhibits attached thereto set forth the following facts. First, Plaintiff alleges that the WHS Defendants corresponded with Plaintiff, who operated out of Essex Ten's office in Auburndale, Massachusetts, concerning the opportunity to purchase Essex Ten's assets.[25] Second, the WHS Defendants conducted their due diligence in cooperation and coordination with Plaintiff. This diligence included extensive communication with Plaintiff, as well as receipt and analysis of regulatory and clinical data from Plaintiff in Massachusetts.[26] Third, the WHS Defendants negotiated the terms of their investment with Plaintiff in Massachusetts.[27] Fourth, the WHS Defendants requested that Plaintiff stay on as CEO of Essex Ten after they had purchased its assets. The WHS Defendants informed Plaintiff that the purchase agreement would be consummated only if he promised to remain as CEO of Essex

---

[24] See Mem. Supp. Mot. Dismiss [#12].

[25] Opp'n Mot. Dismiss [#13], at 1.

[26] Opp'n Mot. Dismiss [#13], at 2.

[27] Opp'n Mot. Dismiss [#13], at 2.

Ten.[28] And, finally, the WHS Defendants proposed and negotiated a contract with Plaintiff for consulting services to be provided after they acquired Essex Ten's assets.[29]

In June 2011, Plaintiff met with Robert Patricelli, President of Women's Health USA, Inc., and several other Women's Health representatives at their office in Avon, Connecticut regarding their interest in investing in Essex Ten.[30] During this meeting, Patricelli met privately with Plaintiff in his office. Patricelli told Plaintiff that he would go forward with a deal only if Plaintiff promised him that he would remain CEO.[31] Patricelli stated that he lacked Plaintiff's skill set and knowledge base and needed to assure his shareholders that Plaintiff would remain as CEO.[32] Plaintiff agreed to stay on as CEO.[33]

After this meeting, Plaintiff honored his promise and remained CEO of Essex Ten and worked to facilitate the WHS Defendants' investment in Essex Ten from his Auburndale office.[34] In the months that followed, Plaintiff engaged in extensive negotiations between the WHS Defendants and Essex Ten.[35] The negotiations included "dozens of phone calls and emails," as well as several more meetings with Patricelli.[36] Plaintiff also accompanied Women's Health

---

[28] Opp'n Mot. Dismiss [#13], at 2.

[29] Opp'n Mot. Dismiss [#13], at 2. This contract was never consummated. Aff. John A. Williams [hereinafter Pl.'s Aff.] [#13-1] ¶ 9.

[30] Pl.'s Aff. [#13-1] ¶ 3.

[31] Pl.'s Aff. [#13-1] ¶ 4.

[32] Pl.'s Aff. [#13-1] ¶ 4.

[33] Pl.'s Aff. [#13-1] ¶ 4.

[34] Pl.'s Aff. [#13-1] ¶ 5.

[35] Pl.'s Aff. [#13-1] ¶ 5.

[36] Pl.'s Aff. [#13-1] ¶ 5.

representatives to New York Downtown Hospital where clinical trials of Essex Ten's products were taking place.[37] These efforts culminated in a letter of intent dated August 8, 2011. In this letter, accepted August 24, 2011, the WHS Defendants agreed to invest $11 million in Essex Ten.[38]

At some point after this, the WHS Defendants purchased a substantial portion of Essex Ten's assets.[39] Essex Ten apparently continues to be licensed to transact business in Massachusetts, although Plaintiff is no longer with the company.[40] Even after Plaintiff left Essex Ten, he continued to work with the WHS Defendants in their acquisition and development of Essex Ten products.[41] In August 2012, after Plaintiff had left Essex Ten and the WHS Defendants had acquired its assets, Plaintiff met with Patricelli to discuss a consulting position with Women's Health USA, Inc. An agreement was drafted but never signed.[42]

On January 29, 2014, the WHS Defendants filed a reply to Plaintiff's opposition. Their reply further develops their argument for dismissal and addresses the factual allegations Plaintiff included in his opposition. Essex Ten filed its answer on February 14, 2014. This court held a hearing on the motion to dismiss on March 5, 2014, and the motion is now ripe for disposition.

---

[37] Pl.'s Aff. [#13-1] ¶ 5.

[38] Pl.'s Aff. [#13-1] ¶ 6.

[39] Pl.'s Aff. [#13-1] ¶ 7. Plaintiff states that the WHS Defendants purchased a controlling interest in Essex Ten. But, as noted above, it appears that this was only an asset purchase. See supra n.22.

[40] Pl.'s Aff. [#13-1] ¶ 7.

[41] Pl.'s Aff. [#13-1] ¶ 8. Plaintiff had at least some follow-up email communication with Patricelli after he left Essex Ten. See Opp'n Mot. Dismiss [#13] Ex. 4.

[42] Pl.'s Aff. [#13-1] ¶ 9. It appears that Plaintiff did not accept this offer because he would have been required to waive any claims he might have against the WHS Defendants and he still had not received any compensation from Essex Ten.

III.   <u>Discussion</u>

The WHS Defendants move to dismiss Count III pursuant to Rule 12(b)(2). They contend that this court lacks personal jurisdiction over them because Plaintiff's claims against them do not arise from any business they transacted in Massachusetts. They further argue that the other constitutional prerequisites to the exercise of jurisdiction are not met.

A.   <u>Burden of Proof and Standard of Review</u>

Although the WHS Defendants have moved to dismiss Count III, it is Plaintiff who bears the burden to prove that this court may exercise jurisdiction.[43] A federal court exercising diversity jurisdiction is treated as the "functional equivalent" of a state court in the forum state for purposes of personal jurisdiction.[44] As such, Plaintiff must show that both the forum state's long-arm statute and the Due Process Clause are satisfied.[45] A district court presented with a motion to dismiss for lack of personal jurisdiction may employ a number of procedural vehicles to resolve it.[46] The "most conventional" of these vehicles is the prima facie standard, which the Parties appear to agree should be used here.[47]

Under the prima facie standard, a plaintiff must proffer sufficient evidence, taken as true, to support findings of all facts necessary to establish personal jurisdiction.[48] Accordingly, the

---

[43] <u>See</u> <u>Newman v. European Aeronautic Defence & Space Co. EADS N.V.</u>, No. 09-10138-DJC, 2011 WL 2413792, at *1 (D. Mass. June 16, 2011); <u>see also</u> <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 50 (1st Cir. 2002).

[44] <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1387 (1st Cir. 1995).

[45] <u>See</u> <u>id.</u>

[46] <u>Foster-Miller, Inc. v. Babcock & Wilcox Can.</u>, 46 F.3d 138, 145–47 (1st Cir. 1995).

[47] <u>See</u> Mem. Supp. Mot. Dismiss [#12], at 4–5; Opp'n Mot. Dismiss [#13], at 5.

[48] <u>Boit v. Gar-Tec Prods., Inc.</u>, 967 F.2d 671, 675 (1st Cir. 1992).

plaintiff must make a showing of all facts necessary to satisfy the Constitution and the

Massachusetts long-arm statute.[49] A plaintiff may not simply rest on his pleadings. Instead, he

must point to "evidence of specific facts in the record" and "'make affirmative proof.'"[50] This

court will accept as true all of Plaintiff's proffered facts and it will "'construe them in the light

most congenial'" to his claim of jurisdiction.[51] This court will also consider facts offered by the

WHS Defendants, to the extent that they are uncontradicted.[52]

    B.    Jurisdictional Requirements

    The Massachusetts long-arm statute provides a number of methods by which a defendant

may subject itself to the Commonwealth's jurisdiction. Here, the Parties agree that the relevant

provision is that authorizing jurisdiction over a defendant who "transact[s] any business" in the

Commonwealth.[53] The Supreme Judicial Court has "interpreted the state's long-arm statute 'as

an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United

States.'"[54] Accordingly, this court may move directly to the constitutional requirements.[55]

    The Due Process Clause requires that a defendant have sufficient contacts with the forum

state, such that "maintenance of the suit" comports with "'traditional notions of fair play and

---

[49] Id.

[50] Id. (quoting Chlebda v. H.E. Fortna & Bro. Inc., 609 F.2d 1022, 1024 (1st Cir. 1986)).

[51] Newman, 2011 WL 2413791, at *1 (quoting Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)).

[52] Id. (quoting Mass. Sch. of Law, 142 F.3d at 34).

[53] Mass. Gen. Laws ch. 223A, § 3(a); Mem. Supp. Mot. Dismiss [#12], at 3; Opp'n Mot. Dismiss [#13], at 5.

[54] Daynard, 290 F.3d at 52 (quoting 'Automatic' Sprinkler Corp. of Am. v. Seneca Foods Corp., 280 N.E.2d 423, 424 (Mass. 1972)).

[55] Sawtelle, 70 F.3d at 1388.

substantial justice.'"[56] A court may exercise either general or specific personal jurisdiction over a defendant. Plaintiff does not argue that the WHS Defendants are subject to Massachusetts' general jurisdiction. This court will therefore consider whether it may exercise specific personal jurisdiction.

The constitutional inquiry breaks down into three separate requirements. First, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities."[57] The relatedness test is a "flexible, relaxed standard."[58] Nevertheless, a court must focus on the "nexus between the defendant's contacts and the plaintiff's cause of action."[59] In a case involving an alleged breach of contract, the appropriate inquiry is "whether the defendant's activity in the forum state was 'instrumental either in the formation of the contract or its breach.'"[60] More generally, "[t]here must be more than just an attenuated connection between the contacts and the claim."[61]

Second, the defendant's contacts with the forum state "must represent a purposeful availment of the privilege of conducting activities in the forum state."[62] This prong of the specific jurisdiction analysis consists of two subsidiary elements: voluntariness and

---

[56] Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

[57] United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp. (Pleasant Street I), 960 F.2d 1080, 1089 (1st Cir. 1992).

[58] Pritzker v.Yari, 42 F.3d 53, 61 (1st Cir. 1994).

[59] Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994).

[60] Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999)).

[61] Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008).

[62] Pleasant Street I, 960 F.2d at 1089.

foreseeability. Voluntariness requires that the defendant deliberately engaged in contact with the forum state, rather than the contact resulting from the unilateral action of another party.[63] Foreseeability requires that the defendant engage in contacts significant enough that it can "reasonably anticipate being haled into court" in the forum state.[64] A defendant's awareness of the plaintiff's presence in the forum state is, by itself, insufficient to confer personal jurisdiction.[65]

Finally, the exercise of jurisdiction must be reasonable upon consideration of the Gestalt factors.[66] There are five such factors a court must consider:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.[67]

Consideration of the Gestalt factors is not a mechanical or well-defined exercise. The weaker a plaintiff's showing under the first two prongs, the less a defendant needs to show in terms of unreasonableness to defeat jurisdiction.[68]

C.    Application

Considering the above factors, Plaintiff has failed to carry his burden make a prima facie showing of jurisdiction. The WHS Defendants make a number of uncontradicted statements

---

[63] Phillips, 530 F.3d at 28.

[64] Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (internal quotation marks and citation omitted).

[65] Phillips, 530 F.3d at 28.

[66] Pleasant Street I, 960 F.2d at 1089.

[67] Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 717 (1st Cir. 1996) (internal citations omitted).

[68] Ticketmaster, 26 F.3d at 210.

regarding their general business (or lack thereof) in Massachusetts. The WHS Defendants are not incorporated in Massachusetts and do not have any subsidiaries incorporated here.[69] No officers of these companies reside in Massachusetts.[70] The WHS Defendants do not have offices or assets in Massachusetts.[71] Finally, the WHS Defendants acquired Essex Ten, a New York company, in an asset purchase agreement that specifies that the Parties will submit to the exclusive jurisdiction of New York courts.[72] The agreement also specifies certain liabilities that the WHS Defendants would assume. Essex Ten's contractual obligations to Plaintiff were not among those obligations.[73]

        1.    <u>Relatedness</u>

The WHS Defendants argue that the claims underlying this action relate to the employment agreement between Essex Ten and Plaintiff, a contract to which they are not a party. In considering whether any of the WHS Defendants' activity in Massachusetts was "'instrumental either in the formation of the contract or its breach,'"[74] they point out that none of the facts submitted by Plaintiff show that they were in any way involved in the contract's formation or Essex Ten's alleged breach.

---

[69] Balogh Decl. [#12-1] ¶ 3.

[70] Balogh Decl. [#12-1] ¶ 3.

[71] Balogh Decl. [#12-1] ¶¶ 4–5.

[72] Balogh Decl. [#12-1] ¶ 9.

[73] Balogh Decl. [#12-1] ¶ 9.

[74] <u>Adelson</u>, 510 F.3d at 49 (quoting <u>Phillips Exeter Acad.</u>, 196 F.3d at 289).

Plaintiff concedes that "[t]he contract at issue in this case . . . dealt exclusively with [Plaintiff's] services as CEO of [Essex Ten]."[75] He also concedes that the contract "that is central to this case does not name the [WHS] Defendants as a party."[76] In an attempt to relate the WHS Defendants' activities to the claims underlying this case, Plaintiff argues that their negotiations with him regarding the acquisition of assets and their request that he remain CEO were somehow "subsequent negotiations and dealings of" his employment agreement with Essex Ten.[77] This argument is unconvincing. Plaintiff's negotiations with the WHS Defendants, in his capacity as CEO of Essex Ten, did not occur until several years after the formation of the employment agreement. Those negotiations also occurred after Essex Ten began breaching the agreement. More important, the negotiations had nothing to do with the obligations of Plaintiff and Essex Ten under the employment agreement. Instead, the subject of the negotiations was the WHS Defendants' interest in investing in or acquiring the assets of Essex Ten. Accordingly, to the extent that the WHS Defendants undertook activities in Massachusetts during these negotiations, those activities are entirely unrelated to the claims underlying this action.

### 2.    Purposeful Availment

The first element of purposeful availment is voluntariness. The WHS Defendants argue that any contact they had with Massachusetts in the course of their negotiations with Plaintiff cannot be considered voluntary because it was Plaintiff who initiated that contact as part of his efforts to obtain funding for Essex Ten. Taking as true all of Plaintiff's factual allegations and viewing them in the light most favorable to the exercise of jurisdiction, Plaintiff has made a

---

[75] Opp'n Mot. Dismiss [#13], at 9.

[76] Opp'n Mot. Dismiss [#13], at 8.

[77] Opp'n Mot. Dismiss [#13], at 9.

prima facie showing that the WHS Defendants' contacts with Massachusetts were voluntary. It is unclear from the limited record here which party initiated discussions regarding investment in Essex Ten. The WHS Defendants' emails and telephone calls to Plaintiff in Massachusetts as part of their due diligence and negotiations, however, were plainly voluntary conduct.

Purposeful availment also requires that the WHS Defendants' contacts with Massachusetts were such that it was foreseeable that they would be haled into court here. The WHS Defendants argue that this element is not met because all of the contact they had with Plaintiff in Massachusetts was directed toward their acquisition of the assets of a New York company. These actions therefore do not constitute purposeful availment of the privilege of transacting business in Massachusetts. Plaintiff contends that there is a persistent enough pattern of conduct that forcing the WHS Defendants to appear in a Massachusetts court would be fair. Plaintiff argues that this persistent pattern included Patricelli's extensive communication with Plaintiff before and after the acquisition of Essex Ten's assets and his offer of a consulting position.

The limited contacts the WHS Defendants had with Massachusetts are insufficient to satisfy the foreseeability requirement. Plaintiff repeatedly concedes in his opposition that Patricelli's negotiations with Plaintiff were in Plaintiff's capacity as CEO of Essex Ten. The First Circuit has held, "in a variety of contexts," that mere awareness of a plaintiff's location is insufficient to establish foreseeability.[78] Here, Plaintiff is largely relying on the fact that he was located in Massachusetts to establish foreseeability. But none of the WHS Defendants' contacts with Plaintiff had anything to do with business in Massachusetts. Instead, they were negotiations with the CEO of a New York company to acquire assets of that company. The mere fact that

---

[78] Phillips, 530 F.3d at 28.

emails and telephone calls were directed to Plaintiff, who happened to work from Essex Ten's Massachusetts office, does not establish that the WHS Defendants were attempting to participate in the economic life of the Commonwealth or that it was foreseeable that they would subject themselves to suit here. Instead, the facts show that the WHS Defendants sought to do business with a New York-based company, as reflected in the asset purchase agreement's forum selection provisions.

Plaintiff never accepted a consulting position with the WHS Defendants and those discussions appear to have no relevance to the claims underlying this action. It is true that Patricelli requested that Plaintiff remain CEO during negotiations, knowing that Plaintiff would be working from Massachusetts. But again, this amounts only to knowledge of Plaintiff's location. It does not indicate the WHS Defendants were attempting to conduct activities in the Commonwealth. Finally, most, if not all, of the in-person meetings Plaintiff references occurred in either Connecticut or New York.[79] Based on the foregoing, Plaintiff has failed to satisfy the purposeful availment prong.

### 3.    The Gestalt Factors

As explained above, where a plaintiff makes a weak showing on the first two factors, a defendant need show only little in the way of unreasonableness to defeat jurisdiction. Moreover, a court need not analyze the Gestalt factors if a plaintiff fails to satisfy the first two prongs of the jurisdictional analysis.[80] Because Plaintiff has failed to make a prima facie showing that the WHS Defendants' limited contacts with Massachusetts are related to the claims underlying this action or represented purposeful availment of the privilege of conducting activities in the state,

---

[79] See Pl.'s Aff. [#13-1] ¶¶ 3, 5.

[80] See Sawtelle, 70 F.3d at 1394 (citing Pleasant Street I, 960 F.2d at 1091 n.11).

this court need not consider the Gestalt factors, which the Parties have not briefed. As a final matter, this court notes that the WHS Defendants are not incorporated Massachusetts, do not maintain a place of business here, and play a very limited role in this action. Plaintiff has not represented that he cannot obtain a judgment against Essex Ten in this action and then undertake collection proceedings against the WHS Defendants in a more appropriate forum, should Essex Ten prove unable to satisfy any judgment that may issue.

IV.     Conclusion

For the foregoing reasons, the WHS Defendants' Motion to Dismiss for Lack of Personal Jurisdiction [#11] is ALLOWED.

AN ORDER HAS ISSUED.

/s/ Joseph L. Tauro
United States District Judge